# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2110
_____

Bradley Landwehr

*Plaintiff - Appellant*

v.

City of Gerald, a municipal corporation; Keith Wehmeyer, in his individual capacity as former mayor; Hillary Ward, in her individual and official capacities as a member of the Board of Aldermen; Stephen Grgurich, in his individual and official capacities as a member of the Board of Aldermen

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: June 11, 2019
Filed: September 23, 2019
[Unpublished]
_____

Before GRUENDER, ARNOLD, and STRAS, Circuit Judges.
_____

PER CURIAM.

Bradley Landwehr sued after he lost his job as the City of Gerald's public-works director. He claimed that he was fired because he publicly supported his brother's mayoral campaign. After a jury disagreed, Landwehr requested a new trial

on two grounds: an alleged *Batson* violation and the exclusion of evidence that he tried to introduce. The district court[1] denied his motion, and we affirm.

## I.

Serving as Gerald's public-works director is a highly coveted and unusually fleeting position. The mayor and the Board of Aldermen initially appointed Landwehr to the job after his predecessor had been demoted. Landwehr held onto the post for nearly three years, until he too was replaced. But less than a year later, the City held an election, and the new mayor and Board—of which his brother was a member—reappointed him.

Landwehr's tenure was again brief. City officials expressed displeasure with his purchasing decisions, his delay in "clos[ing] an open sewage lagoon," his handling of the "failure of a pressurized lift station," and "the location of a fire hydrant." Then, a bit less than two years after he was appointed for the second time, he was fired again. Although Landwehr was briefly reinstated after he successfully challenged the decision, he was fired once more just weeks later when the City elected a new mayor and Board.

Landwehr finally had enough and sued the City, the new mayor, and two individual Board members for, as relevant here, allegedly violating his First Amendment rights. He presented evidence that the newly elected mayor had been overheard at a polling station conspiring to "get rid of him" because he had "campaign[ed] for his brother." Nevertheless, the jury returned a verdict against him.

At trial, Landwehr unsuccessfully objected to two decisions, both of which he now challenges on appeal. First, the district court rejected his argument that the

---

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

defendants' peremptory strike of the only black prospective juror was racially discriminatory. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991) (extending the rule from *Batson v. Kentucky*, 476 U.S. 79 (1986), to civil cases). Second, it excluded evidence of laws and policies that, according to Landwehr, showed that the City bypassed its normal procedures when it fired him. Landwehr renewed these challenges in a motion for a new trial, but the court again ruled against him.

## II.

The first issue is Landwehr's claim that the defendants' peremptory strike was motivated by racial discrimination. *Edmonson*, 500 U.S. at 616; *see also Batson*, 476 U.S. at 89. All that is at issue here is the third step of the *Batson* framework: whether the district court was right that Landwehr had not "shown purposeful discrimination." *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (citation omitted). In rejecting his *Batson* claim, the court credited the defendants' race-neutral explanation that the juror's answers during voir dire presented a risk that he would be a "wild card" and potentially refuse to follow the law or the court's instructions. *See Swope v. Razzaq*, 428 F.3d 1152, 1154–55 (8th Cir. 2005) (per curiam). We review a finding like this one "for clear error and with great deference," *id.* at 1154, keeping in mind that "determinations of credibility and demeanor lie peculiarly within [the] trial judge's province," *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (internal quotation marks and citation omitted).

On this record, we cannot say that the district court clearly erred. When asked whether he could "follow all of the instructions" and "be a fair and impartial juror," the juror responded that he would "try." He also claimed to be dissatisfied with the handling of an earlier civil case in which he had been a defendant. It was reasonable for the court to conclude that these statements, taken together, could have cast doubt on the juror's ability to objectively apply the law to the facts. *See Swope*, 428 F.3d at 1153–55 (affirming the denial of a *Batson* challenge even though the defendant struck *all three* prospective black jurors, including one because he "was a long-time

casino employee . . . [who] might have a 'lotto mentality' and [thus] view a personal injury lawsuit as an opportunity to strike it rich").

To be sure, Landwehr offers counterarguments suggesting that the defendants had an improper motive, but nothing establishes the "exceptional circumstances" necessary to reverse on a deferential, clear-error standard of review. *Snyder*, 552 U.S. at 477 (citation omitted). He first argues that the juror's statements, if anything, favor the defense, which should have drawn the defendants' race-neutral explanation into doubt. Landwehr's view of the record is plausible. But so was the one the district court accepted: that the defendants decided it was too risky to have an unpredictable juror, even if there was reason to suspect that the unpredictability would have worked to their advantage. Landwehr also points out that, at other times, the juror stated that he was willing to follow the law and the court's instructions. But even these dutiful answers may not have been enough to ease the defendants' discomfort over his more tepid promise to "try," especially in light of the other answers he gave.

### III.

Landwehr's argument about the excluded evidence fares no better. At trial, he attempted to introduce a Missouri statute, multiple municipal ordinances, and an employee handbook to show that the City did not follow its usual procedures when it fired him. Even assuming that the court should have admitted the evidence, we doubt that "a new trial would likely produce a different result." *Harrison v. Purdy Bros. Trucking Co.*, 312 F.3d 346, 351 (8th Cir. 2002) (citation omitted).

The excluded evidence fell into one of two categories: it either did not establish that the City deviated from its normal procedures or else contradicted Landwehr's position altogether. In the first category were two municipal ordinances that have nothing to do with removing a public-works director. *See* Gerald, Mo., City Code § 110.055 (addressing the appointment of Board committees); *id.* § 115.120 (discussing the appointment of the City treasurer). In the second were a

state statute and a nearly identical municipal ordinance that allow the mayor and the Board to "remove from office *any appointive officer of the city at will*," Mo. Rev. Stat. § 79.240 (emphasis added); *accord* Gerald, Mo., City Code § 115.040. Likewise, the employee handbook says that problematic employees "may be . . . removed *at any time*" by a majority vote of the Board. (Emphasis added). These sources are at odds with Landwehr's argument that he was *entitled* to a hearing or other process before his termination.

Moreover, Landwehr presented other, far more probative evidence that made a similar point. For example, the jury heard testimony that the new mayor planned to fire Landwehr from the beginning because he had openly backed his brother's candidacy. The jury also learned that Landwehr lost his job shortly after the election and that he did not receive a post-termination hearing, as he had after being fired just a few months earlier. And other evidence showed that the City had taken a more deliberate approach to replacing department heads in the past. Given that this evidence did not convince the jury, it is unlikely that any of the additional evidence, which was equivocal at best, would have tipped the balance in his favor.

IV.

We accordingly affirm the judgment of the district court.
_____